**Maria Witt, OSB No. 145573**
Albies & Stark, LLC
1500 SW First Ave., Suite 1000
Portland, Oregon 97201
Tel: (503) 654-7006
maria@albiesstark.com

**Steven A. Toff, WSBA No. 59575**
*Pro Hac Vice Pending*
Bread and Roses Law Group
5030 First Ave S., Suite 104-B
Seattle, Washington 98134
Tel: (206) 705-3006
steven@breadandroseslaw.com

**Of Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **BILLIE LITTLE,** an individual,<br><br>      Plaintiff,<br><br>v.<br><br>**THOMSON REUTERS CORPORATION,** a Delaware Corporation.<br><br>      Defendant. | Case No.<br><br>**COMPLAINT**<br><br>Whistleblower Retaliation<br>O.R.S. § 659A.199<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.

Billie Little, a Senior Attorney Editor for Thomson Reuters Corporation, was fired

on March 20, 2026, because she reported her belief that Thomson Reuters' products

PAGE - 1   COMPLAINT

were being used to compile and deliver sensitive personal and location data to federal immigration authorities in ways that violated the law. Specifically, Little learned that immigration enforcement activity in Minnesota in January 2026 was supported by Thomson Reuters' data tools. Little believed that Thomson Reuters was knowingly facilitating or contributing to unlawful conduct, including violations of constitutional protections and state law privacy, data and sanctuary city protections. She further understood that these violations extended beyond Minnesota to other jurisdictions, including Oregon.

Little led a group of approximately 200 Thomson Reuters employees, founded and led a workplace "Committee to Restore Trust," and co-authored and co-signed an open letter to Thomson Reuters' executive leadership and board of directors, voicing concerns that Thomson Reuters' products were being used in ways that violated the law. Little informed her direct supervisor of her role in reporting unlawful conduct before the letter was transmitted. Thomson Reuters knew that Little was a key leader and participant in opposing its conduct.

Within weeks of the open letter being sent, and within days of a *New York Times* article describing these employee concerns, Thomson Reuters launched an internal investigation targeting Little. On March 20, 2026, Thomson Reuters fired Little, citing a purported Code of Conduct violation — a pretext designed to mask retaliation.

Of the many employees who participated in raising these concerns, Little is, to her knowledge, the only employee who was fired. She was singled out because she was the most visible leader and Thomson Reuters sought to make an example of her. Thomson Reuters' conduct violates O.R.S. § 659A.199, which protects whistleblowers

PAGE - 2  COMPLAINT

ALBIES & STARK, LLC
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

from retaliation. Plaintiff brings this action to obtain redress for the harms she has suffered.

## PARTIES AND JURISDICTION

2.

Plaintiff Billie J. Little is an individual who, at all relevant times, was an Oregon resident. Plaintiff holds a Juris Doctor degree. At the time of her termination, she had been engaged in legal publishing work for Thomson Reuters Corporation and its predecessor entities for nearly two decades, first as an employee in New Zealand beginning in 2005, then as a remote contractor beginning in 2008, and most recently as a full-time U.S. employee beginning in August 2025. She worked for Thomson Reuters as a Senior Attorney Editor in an editorial and legal publishing capacity.

3.

Defendant Thomson Reuters Corporation is a foreign corporation with operations throughout the United States, including in Oregon. Defendant is a global information services company best known for its Westlaw legal database, its Reuters news service, and, most importantly for this Complaint, it's CLEAR investigative database. Defendant conducts substantial business in Oregon and is registered to do business in this state.

4.

At all material times, Defendant was Plaintiff's employer.

5.

The amount in controversy in this case exceeds the sum or value of $75,000.

PAGE - 3   COMPLAINT

**ALBIES & STARK, LLC**
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

6.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

### Plaintiff's Employment Background

7.

Plaintiff's work experience with Thomson Reuters spans nearly two decades. She began working for Thomson Reuters' predecessor entity, Brookers (New Zealand), in June 2005 as a Legal Editor. Thomson Reuters integrated Brookers into its global structure in 2008, at which point Plaintiff began working directly for Thomson Reuters. When Plaintiff returned to the United States in early 2008, she continued working remotely as a contractor providing legal editorial services for Thomson Reuters for the next seventeen years. At all times during her contractor tenure, Plaintiff excelled at her position, maintained a positive professional relationship with Thomson Reuters and performed her work without incident.

8.

In August 2025, Plaintiff was offered the role of Attorney Editor at Thomson Reuters' U.S. operations. Based on her extensive experience, Defendant ultimately offered Plaintiff the higher-level position of Senior Attorney Editor. Plaintiff accepted and commenced her U.S. employment role in or around September 2025, reporting to manager Dawn Ziegler.

/ / /

/ / /

PAGE - 4   COMPLAINT

9.

Plaintiff's performance history was consistently positive. As recently as February 2026, Plaintiff received both a prorated annual bonus and a merit raise of 2%, for a position she only formally started less than 5 months earlier.

10.

Prior to her termination, Plaintiff had never received any disciplinary action, write-up, negative performance review, or formal criticism in nearly two decades of working for the company.

**Thomson Reuters' CLEAR Product and Contract with ICE**

11.

In her role as a Senior Attorney Editor, Plaintiff was generally familiar with the company's investigative database product known as CLEAR. Thomson Reuters' CLEAR (Consolidated Lead Evaluation and Reporting) is a database that aggregates "billions of data points" about individuals, including typically hard-to-find information, such as addresses, height, weight, drivers' license data and driving records, arrest and court records, business filings, and social media profiles.[1] CLEAR also incorporates license plate recognition ("LPR") data, providing access to more than 20 billion license plate sighting records from a nationwide network of surveillance cameras.[2]

---

[1] https://legal.thomsonreuters.com/en/insights/case-studies/clear-investigation-software-providing-community-support (last accessed April 2, 2026); https://inthesetimes.com/article/ice-deportation-machine-surveillance-artificial-intelligence-thomson-reuters-clear-trump (last accessed April 2, 2026)
[2] https://legal.thomsonreuters.com/blog/leveraging-license-plate-recognition-lpr-data-for-enhanced-corporate-security/ (last accessed April 2, 2026)

PAGE - 5   COMPLAINT

12.

Thomson Reuters holds significant contracts with the United States Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) for the provision of CLEAR and related services. These contracts include a CLEAR subscription and identity-location capability contract, access to LPR data, and a five-year contract valued at approximately $22.8 million with DHS for investigative database subscription services.[3] In May 2025, ICE paid Thomson Reuters $5 million specifically for license plate reader data, described in federal procurement records as provided to "enhance investigations for potential arrest, seizure, and forfeiture."[4] Several of these contracts were due for renewal as early as April 2026.

13.

Plaintiff learned that Thomson Reuters' provision of commercial LPR and identity data to ICE has a significance that goes beyond the dollar value of its contracts. Because commercial data vendors are not subject to the same legal restrictions as government agencies, ICE can access through Thomson Reuters data from jurisdictions that have enacted laws restricting direct data sharing with federal immigration authorities — including sanctuary jurisdictions. Plaintiff read reporting in which Emily Tucker, Executive Director of the Center on Privacy and Technology at Georgetown Law, explained that if states cut off ICE's access through official channels, the agency can obtain equivalent data through commercial brokers like Thomson Reuters.[5]

---

[3] *Id.*

[4] https://www.biometricupdate.com/202511/ices-license-plate-app-quietly-expands-a-nationwide-surveillance-web (last accessed April 2, 2026)

[5] https://americandragnet.org/ (last accessed April 2, 2026)

**ALBIES & STARK, LLC**
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

14.

Upon learning of this mechanism, Plaintiff drew on two sources of knowledge that gave her an unusually informed basis for assessing its legal significance. First, her nearly two decades of legal publishing work — reading, editing, and publishing legal materials across a broad range of practice areas — had given her familiarity with privacy law, data protection frameworks, and state and local sanctuary statutes. Second, her long familiarity with Thomson Reuters as a company — including its data products, its representations to customers and regulators about how its data is collected and used, and its public commitments to legal compliance — gave her a concrete basis for evaluating whether the company's conduct was consistent with those representations.

15.

Based on this combined knowledge, Plaintiff reasonably concluded that one or more of the following was true:

a) that Thomson Reuters was obtaining sensitive personal data — including location data, identity information, and data from jurisdictions with restrictive privacy laws — through means that misrepresented to data sources, regulators, or the public how that data would be used and to whom it would be sold;

b) that Thomson Reuters was reselling such data to ICE and others in ways that violated the terms under which it was originally collected, constituting a form of fraud or material misrepresentation;

PAGE - 7  COMPLAINT

c) or that Thomson Reuters had, at minimum, failed to exercise reasonable care in ensuring that its data collection, aggregation, and resale practices complied with applicable sanctuary laws, state privacy statutes, and constitutional requirements — conduct that, whether intentional or negligent, Plaintiff reasonably believed violated the law.

Plaintiff understood that Thomson Reuters' public representations about safeguards and permissible use were impossible to reconcile with what the commercial data broker mechanism was actually enabling in practice.

16.

Plaintiff regularly read and followed news accounts of DHS's Operation Metro Surge in Minneapolis-St. Paul and its consequences. She discussed those accounts with colleagues at Thomson Reuters, many of whom lived and worked in the affected communities. Through that reporting and those conversations, Plaintiff learned that the federal immigration enforcement efforts in Operation Metro Surge were marked by conduct she reasonably believed was unlawful — and that Thomson Reuters' data products were implicated in that conduct.

17.

Plaintiff learned that on January 7, 2026, Renée Good, a 37-year-old U.S. citizen, was shot and killed by an ICE agent in Minneapolis while sitting in her car attempting to execute a turn. Plaintiff learned that on January 24, 2026, Alex Pretti, a 37-year-old U.S. citizen and ICU nurse at the Minneapolis Veterans Affairs hospital, was shot and killed by federal agents while using his phone to film law enforcement activity on a public street and intervening to protect a woman who had been pushed to the ground by

PAGE - 8   COMPLAINT

**ALBIES & STARK, LLC**
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

agents. Both killings were captured on video by bystanders, covered extensively by every major national news outlet in the country, and were the subject of congressional investigation and bipartisan condemnation.

18.

These events drew heightened media attention to Minnesota. Plaintiff also read and was aware of accounts describing how ICE agents were utilizing commercial data tools — including license plate reader networks — to identify, locate, and track individuals and community observers in ways she reasonably believed exceeded any lawful enforcement purpose. Specifically, Plaintiff read reports of ICE agents scanning the license plates of bystanders and observers who were lawfully exercising First Amendment rights, then calling those individuals by name and reciting their home addresses, or even driving to their homes—conduct Plaintiff reasonably understood to be enabled by commercial investigative databases of the kind she also knew that Thomson Reuters provided to ICE. Plaintiff further understood, based on her familiarity with Thomson Reuters' products and her knowledge of applicable law, that this use of CLEAR data to identify and intimidate lawful observers was not authorized by the terms under which Thomson Reuters represented its products could be used.

**Plaintiff's Protected Activity**

19.

On January 27, 2026, days after Pretti's shooting, a post appeared on Thomson Reuters' company-wide intranet identifying Thomson Reuters as one of the top ten corporate collaborators with ICE immigration enforcement activity. Employees commented on the post expressing alarm, concern, and questions about the

PAGE - 9  COMPLAINT

company's role. Thomson Reuters management closed the comment section shortly thereafter.

20.

Following the closure of the comment section, Plaintiff immediately contacted a colleague on Microsoft Teams to continue the conversation. Together, Plaintiff and her colleague formed an internal Teams chat group that quickly grew to approximately 200 Thomson Reuters employees, to discuss shared concerns about the company's contracts with ICE.

21.

Plaintiff led the establishment of the Committee to Restore Trust, a group of Defendant's employees who opposed the illegal use of Defendant's products to enable activities in violation of federal, state, and local laws.

22.

On or about February 20, 2026, the Committee to Restore Trust transmitted two documents to Thomson Reuters' executive leadership, board of directors, legal and compliance personnel, and numerous other recipients: (1) a Statement from the Committee to Restore Trust, and (2) an Open Letter concerning ICE and Thomson Reuters' contracts, signed by Plaintiff and approximately 169 other employees. The letter formally raised concerns regarding CLEAR, LPR access, and continuous monitoring services, and requested transparency, due diligence disclosures, safeguard information, and an all-hands meeting. In part, the letter stated:

PAGE - 10  COMPLAINT

**ALBIES & STARK, LLC**
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

**Professional Responsibilities at Stake**

Many Thomson Reuters workers are licensed attorneys and certified professionals bound by oaths to uphold the Constitution and protect civil liberties. We are troubled by the possibility that TR products may enable activities that violate constitutional protections – including Fourth Amendment protections against unreasonable search and seizure, Fifth Amendment due process rights, and Fourteenth Amendment equal protection guarantees. For professionals bound by codes of ethics, this creates an untenable conflict between employment and licensure obligations.

**Legal Compliance Concerns**

Thomson Reuters products may be used in ways that conflict with state and local laws in sanctuary jurisdictions, as well as data protection and privacy regulations at multiple governmental levels. When investigative tools enable federal agencies to access data in ways that circumvent state and local privacy protections, we risk facilitating violations of laws that fall under the jurisdiction of state attorneys general, local prosecutors, and data protection authorities.

23.

Plaintiff engaged in protected activity within the meaning of O.R.S. § 659A.199 by reporting information that she reasonably and in good faith believed constituted evidence of violations of state and federal law, including but not limited to: (a) violations of Fourth Amendment protections against unreasonable search and seizure arising from the use of CLEAR and LPR technology to surveil and track individuals without judicial authorization; (b) violations of Fifth and Fourteenth Amendment due process guarantees arising from enforcement activities conducted with the assistance of Thomson Reuters' products; (c) violations of state and local privacy laws in sanctuary jurisdictions arising from the use of commercially sourced data to circumvent those protections; and (d) violations of contractual limitations on the permissible use of CLEAR by ICE and related agencies.

24.

Prior to the transmission of the February 20, 2026, documents, Plaintiff informed her direct supervisor, Dawn Ziegler, that the Committee to Restore Trust was preparing to send the letter to leadership.

PAGE - 11  COMPLAINT

25.

The open letter was widely circulated. It was transmitted to senior executives including the CEO, CFO, Chief People Officer, and General Counsel, as well as to members of the Board of Directors, Legal, Compliance, HR Compliance, Ethics, and numerous senior managers and team leads.

26.

The letter and the Committee's efforts were subsequently covered by the Minnesota Star Tribune on or around March 3, 2026, and by The New York Times on or around March 11, 2026, bringing the employee campaign to national attention.

**Defendant's Investigation and Termination of Plaintiff**

27.

Media coverage significantly elevated public and reputational pressure on Defendant regarding its ICE contracts. Within five days of the New York Times' article's publication, Defendant shifted from responding to employee whistleblowing to investigating and targeting its leader, Plaintiff.

28.

On Monday, March 16, 2026, Plaintiff was called in to a meeting with HR Manager Kami Peterson. Ms. Peterson told Plaintiff she was being investigated for violating confidentiality and data sharing policies.

29.

On Friday morning, March 20, 2026, Defendant fired Plaintiff, allegedly for violating the company's "Code of Conduct." Defendant did not provide a termination

PAGE - 12  COMPLAINT

**ALBIES & STARK, LLC**
1500 SW FIRST AVE., SUITE 1000, PORTLAND, OR 97201
TEL 503.308.4770 | FAX 503.427.9292

letter, written findings from any investigation, or any written explanation of which Code of Conduct provisions she had allegedly violated.

30.

Based on information and belief, no other employees were fired. Plaintiff was singled out and targeted as the leader in opposing Defendant's unlawful conduct.

**Harm to Plaintiff**

31.

As a result of Defendant's unlawful actions, Plaintiff has suffered lost wages and fringe benefits in an amount to be determined at trial.

32.

Plaintiff is entitled to reinstatement of her employment or, in the alternative, an award of lost future wages and benefits in an amount to be determined at trial.

33.

As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress and other compensatory damages in an amount to be determined at trial.

34.

Plaintiff is entitled to an award of costs and attorney fees in an amount to be determined at trial pursuant to ORS 659A.885 and ORS 20.107.

**CLAIM FOR RELIEF**
**O.R.S. § 659A.199**
**Whistleblower Retaliation**

35.

Plaintiff re-alleges and incorporates by reference the above paragraphs.

PAGE - 13  COMPLAINT

36.

Defendant retaliated against Plaintiff by firing her for reporting in good faith information she believed was evidence of violations of state or federal laws, rules, or regulations.

37.

Defendant's acts and omissions directly and proximately caused Plaintiff's injuries, including lost wages and benefits, compensatory damages, and emotional distress in an amount to be determined at trial.

38.

Plaintiff realleges damages, costs, and attorneys' fees as set forth in paragraphs 31-34 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for her costs and disbursements incurred herein and for the following in accordance with the proof at trial:

1.     An Order voiding the decision of Defendant to terminate her employment;

2.     An award of lost wages and fringe benefits, reinstatement, backpay, and lost future wages and benefits in an amount to be determined at trial;

3.     An award of compensatory damages for emotional distress in an amount to be determined at trial;

4.     An award of prejudgment and post-judgment interest at the legal rate as well as an additional sum to offset the increased tax liability of any award;

5.     An award of costs and reasonable attorney fees; and

6.     For such other and further relief as the Court may deem appropriate.

PAGE - 14  COMPLAINT

**DATED** this April 14, 2026

s/ *Maria Witt*
**Maria Witt, OSB No. 145573**
**Albies & Stark LLC**
1500 SW First Ave., Suite 1000
Portland, OR 97201
Ph: 503-654-7006
maria@albiesstark.com

**Steven A. Toff, WSBA 59575**
*Pro Hac Vice Pending*
**Bread And Roses Law Group**
5030 1st Ave S., Suite 104-B
Seattle, Washington 98134
Tel: 206.705.3006
steven@breadandroseslaw.com

*Of Attorneys for Plaintiff*

PAGE - 15   COMPLAINT